# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-00500-SCT

*OMNOVA SOLUTIONS, INC.*

*v.*

*THERESA LIPA*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:                    02/27/2008
TRIAL JUDGE:                         HON. LEE J. HOWARD
COURT FROM WHICH APPEALED:           LOWNDES COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:             CHRISTOPHER RAY FONTAN
                                     STEPHEN J. CARMODY
ATTORNEY FOR APPELLEE:               ROGER K. DOOLITTLE
NATURE OF THE CASE:                  CIVIL - WORKERS' COMPENSATION
DISPOSITION:                         REVERSED AND REMANDED - 08/12/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Fifty-two-year-old Theresa Lipa, an eighteen-year employee of Omnova Solutions,

Inc. ("Omnova"), suffered a work-related injury in July 2000. Lipa returned to work at

Omnova in her preinjury position, at her preinjury wage rate, after first filing a Petition to

Controvert with the Mississippi Workers' Compensation Commission ("MWCC") asserting

"[t]otal loss of wage[-]earning capacity." A rebuttable presumption existed that Lipa had

suffered no loss of wage-earning capacity, as she continued to work in her preinjury position,

at her preinjury wage rate. It was not until four or five months later that layoffs at Omnova

prompted a coworker with seniority to "bump" Lipa to a lower-paying position. Lipa's

demotion to the lower-paying position was caused by the coworker exercising a privilege accorded by operation of the collective bargaining agreement between Omnova and a local union of the United Steelworkers of America, totally unrelated to her work injury. Lipa offered no evidence that she unsuccessfully had attempted to find employment elsewhere.

¶2.     Following a hearing, an administrative judge concluded that Lipa had sustained a "loss of wage-earning capacity due to her work injury[,]" and ordered, *inter alia*, that Omnova pay Lipa "[p]ermanent disability benefits of $30.02 . . . for a period of 450 weeks as compensation for the disability [Lipa] sustained from her work injuries." The Commission Order of the MWCC affirmed the Order of the administrative judge, which the Circuit Court of Lowndes County, Mississippi, subsequently affirmed. Thereafter, the Mississippi Court of Appeals affirmed the judgment of the circuit court. *See Omnova Solutions, Inc. v. Lipa*, – So. 2d –, 2009 WL 596662, at *5 (Miss. Ct. App. March 10, 2009). Subsequently, this Court granted Omnova's Petition for Writ of Certiorari. *See Omnova Solutions, Inc. v. Lipa*, 27 So. 3d 404 (Miss. 2010).

**FACTS**

¶3.     On July 20, 2000, Lipa was struck by a forklift while in the course and scope of her employment with Omnova. As a result, Lipa suffered injuries including, *inter alia*, urinary incontinence and back pain. At the time of her injury, Lipa was employed as a let-off operator.[1]

---

[1]According to Lipa, a let-off operator engages in bending, stooping, and lifting, and the position required her to lift approximately sixty pounds "eight to ten times during an eight-hour shift."

2

¶4. From July 21, 2000, until July 30, 2000, Lipa received temporary total disability benefits of $303.35 per week. Lipa then returned to her let-off-operator position with Omnova. However, several months later, Lipa again discontinued her employment at Omnova due to pain and remained off work for approximately two years. For this period, Lipa received temporary total disability benefits of $303.35 per week.

¶5. Before returning to work, on March 26, 2002, Lipa filed a Petition to Controvert with the MWCC, claiming a "[t]otal loss of wage[-]earning capacity." In June 2002, Dr. Robert Smith released Lipa to return to work in early July 2002 with "*light duty* from a spine standpoint . . . for *six months*[2] and *then advance to full duty*." (Emphasis added.) Dr. Smith assigned Lipa a ten-percent anatomical impairment rating to her "body as a whole," and provided that the impairment would impact Lipa in lifting, standing, and bending. It was stipulated that Lipa reached maximum medical improvement on July 8, 2002.

¶6. When Lipa returned to work in the summer of 2002, she once again was employed as a let-off operator at her preinjury wage rate. According to both Lipa and Doug Pugh, a

---

[2]Dr. Smith's "light duty" instructions provided:

Lifting – Less than 20-25% of body weight.
Standing – 2 hours at a time without relief.
Sitting – Unlimited except for occasional change of positions.
Frequent lifting – 15% of body weight no more than 10 times per hour. This is at waist level. From floor, 5-10 pounds only occasionally in an 8 hour day with back straight.
Bending – From the waist to floor[;] 1-2 times per hour without weight.
Carrying – 20% body weight, less than 100 feet, a few times per hour.
Hand function – Not limited.
Driving machinery – Permitted with vibration minimized. Must have frequent breaks.
Climbing – Not limited.

thirty-six-year employee of Omnova and the local union president, Lipa had difficulty performing the job functions of the let-off-operator position. Lipa testified that "I was able to do the job because I had a girl that I had worked years with; and me and her worked together. And she helped me lift the manual when I'd have to lift it and put it in the rows." According to Lipa, she would not have been able to perform such work without that aid,[3] and she had registered complaints with both her supervisor and the company nurse about the effect of that work on her back.[4]

¶7.     Approximately four or five months later, according to Pugh, there were "several layoffs, and I think *it was a layoff. [Lipa] got bumped. [Lipa] got bumped off the job. A higher seniority employee displaced her.*" (Emphasis added.) Pugh admitted that Lipa was "bumped" due to factors unrelated to her work injury. Pugh added that, under the collective bargaining agreement, Lipa could have done nothing to avoid getting "bumped."

¶8.     On November 15, 2006, a hearing was held before Administrative Judge Tammy Green Harthcock. At the hearing, Sam Cox, an expert in "vocational consulting," testified that Lipa "does not have a lost wage capacity[,]" because "when she returned to her position with Omnova . . . , she returned in the position that she left at the same rate of pay and was actively employed in that position." Cox's "Initial Vocational Evaluation" of Lipa concluded that "[b]ased upon [Lipa's] age, education, past work history, guidelines to return to employment and the fact that she is currently employed, it is my impression that she

---

[3]Lipa acknowledged that Omnova never objected to her receiving such aid. Moreover, Omnova's representative, Kathy Brown, testified that Omnova had accommodated employee restrictions in the past.

[4]The record provides no further proof of such alleged complaints.

maintains the ability to remain employed in and around her current living area and *has no loss of wage[-]earning capacity*." (Emphasis added.) Cox also testified that if Lipa were unable to work at Omnova, "of course" she would experience some loss of wage-earning capacity. Cox explained further:

> [t]hat would be common. That's why all these other variables play into it like her age and her education and her past work because anytime that you begin a new occupation, if she had to, that's going to be the lowest point of her earning ability.
>
> When she first started at Omnova some 18 years ago, I doubt if she was making the same amount of money that she's making presently or returned to, and when she worked at Revco for 12 years, I'm sure that when she completed those 12 years, she was making more than at the beginning.
>
> So, of course, if she changed jobs, she would have a loss of wage-earning capacity at that time. That's not to say, after a number of years – which she has a good work history with a number of these employers – that if she completed the job duties and responsibilities successfully as she has demonstrated in the past, that her salary would increase.

¶9.   On January 3, 2007, the "Order of the Administrative Judge" was filed. Regarding Lipa's physical injury, the administrative judge decided that:

> [Lipa] had a back injury and was given a 10% permanent medical impairment rating by her treating specialist, [Dr. Smith]. Further, she was restricted from lifting over 20 to 25% of her body weight, standing more than two hours at a time without a break, frequent lifting over 15% of her body weight for more than ten times per hour (waist level, from floor, 5 to 10 pounds occasionally in an 8 hour day with a straight back), bending more than one to two times per hour without weight from waist to floor, carrying over 20% of her body weight more than 100 feet one to two times per hour, and operating machinery with vibration not minimized but must have frequent breaks.[5]

As to Lipa's wage-earning capacity, the administrative judge found that Lipa:

---

[5]This Court notes that the listed restrictions were Dr. Smith's "light duty" instructions for the first six months.

has proven that she sustained a loss of wage-earning capacity due to her work injury. Although she returned to her pre-injury position for a few months, [Lipa] testified that she had to have assistance with lifting from a co-worker who was her friend. After just three or four months,[6] *she was placed in the factory trucker position due to a lay-off* by [Omnova] *and* then *was unable to return to her pre-injury position*.[7]

(Emphasis added.) The administrative judge then found that:

[b]ased upon [Lipa's] age, her education, her work history, her permanent physical restrictions, the medical evidence, the lay evidence, and the evidence as a whole, I find that [Lipa] has sustained a $45.00 [weekly] *loss* of wage-earning capacity *due to her work injury*. This amount is an estimate derived from the calculations provided at the hearing that [Lipa] has suffered from an approximate $2,300 per year loss of wages due to her post-injury position.[8]

(Emphasis added.) Despite finding that Lipa had been placed in the lesser-paying position "due to a layoff[,]" the administrative judge ordered, *inter alia*, that Omnova pay Lipa "[p]ermanent disability benefits of $30.02 beginning July 9, 2002, and continuing for a period of 450 weeks as compensation for the disability [Lipa] sustained from her work injuries."

¶10. After Omnova filed a Petition for Review with the MWCC, a Commission Order affirmed the Order of the administrative judge. Omnova then filed a Notice of Appeal to Circuit Court. The circuit court affirmed the Commission Order, finding that it was

---

[6]Lipa estimated that she remained in her pre-injury position for four to five months before being "bumped."

[7]The only evidence presented is that the collective bargaining agreement, not her work injury, prevented Lipa's return.

[8]At the hearing, evidence was presented estimating that, in the factory-trucker position, Lipa would earn $50,650.18/year, while in the incentive-based, let-off-operator position she would earn $52,945.36/year.

"supported by substantial evidence and the applicable law." From that ruling, Omnova filed a Notice of Appeal.

## COURT OF APPEALS PROCEEDINGS

¶11.   On March 10, 2009, the Court of Appeals affirmed the judgment of the circuit court.[9] *See **Lipa***, 2009 WL 596662, at *5. In Issue I, the Court of Appeals specifically addressed: "Did Lipa sustain a loss of wage-earning capacity?" *Id*. at *2.

¶12.   Preliminarily, the Court of Appeals acknowledged that Lipa "returned to her job as let-off operator[,] . . . remained at her pre-injury wage[,]" and "remained in this position for approximately five months before being 'bumped' by another employee with greater seniority." *Id*. at *1. Moreover, the Court of Appeals noted that "[w]hen a claimant's post-injury earnings are equal to or exceed pre-injury earnings, there is a presumption of no loss of wage-earning capacity." *Id*. at *3 (citation omitted). Nonetheless, the Court of Appeals concluded that:

> [d]espite the fact that Lipa initially returned to her pre-injury job at her pre-injury wage of approximately $50,000 per year after the accident, we find that the [MWCC] did not err in finding a loss of wage-earning capacity. . . . Cox was unable to find any other jobs in the general labor market for a person with Lipa's education and experience that would pay a comparable salary. *According to Cox's testimony, if Lipa were not able to work at Omnova, she would suffer a loss of wage-earning capacity.*
>
> *After reviewing Lipa's age, education, work history, and physical restrictions, it is apparent that she has suffered a loss in wage-earning capacity.* We find that the Commission's findings were based on substantial evidence.

*Id*. (emphasis added).

---

[9]The opinion was authored by Lee, P.J.; King, C.J., Myers, P.J., Irving, Barnes, Ishee, Roberts, and Carlton, JJ., concurring; Griffis and Maxwell, JJ., not participating.

¶13.	On November 17, 2009, the Court of Appeals denied Omnova's Motion for Rehearing. On February 18, 2010, this Court granted Omnova's Petition for Writ of Certiorari. *See Lipa*, 27 So. 3d at 404.

**ISSUE**

¶14.	This Court will consider:

> Whether the MWCC was presented with substantial evidence that Lipa sustained a loss of wage-earning capacity because of her work-related injury.

**ANALYSIS**

¶15.	This Court has stated that:

> [t]he standard of review in a workers' compensation appeal is limited to whether the [MWCC's] decision is supported by substantial evidence. ***Walker Mfg. Co. v. Cantrell***, 577 So. 2d 1243, 1245-47 (Miss. 1991). "The [MWCC] is the trier and finder of facts in a compensation claim, the findings of the [ALJ] to the contrary notwithstanding." ***Smith v. Container Gen. Corp.***, 559 So. 2d 1019, 1021 (Miss. 1990). This Court will reverse an order of the [MWCC] only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence. ***Vance v. Twin River Homes, Inc.***, 641 So. 2d 1176, 1180 (Miss. 1994).

***Lott v. Hudspeth Ctr.***, 26 So. 3d 1044, 1048 (Miss. 2010). In applying this standard, this Court is cognizant that the Mississippi Workers' Compensation Law "is construed liberally, and doubtful cases are to be resolved in favor of compensation so that the beneficent purposes of the act may be achieved." ***Robinson v. Packard Elec. Div.***, 523 So. 2d 329, 332 (Miss. 1988) (citations omitted).

¶16.	The Workers' Compensation Law provides that "[c]ompensation shall be payable for disability . . . of an employee from injury . . . arising out of and in the course of employment . . . ." Miss. Code Ann. § 71-3-7 (Rev. 2000). The Law defines "disability" as "incapacity

*because of injury* to earn the wages which the employee was receiving at the time of the injury in the same or other employment . . . ." Miss. Code Ann. § 71-3-3 (Rev. 2000) (emphasis added). This Court has stated that "[t]he question of degree and duration of disability[10] is one of fact. The degree of disability is determined by (1) actual physical injury and (2) loss of wage[-]earning capacity.[11]" *Spann v. Wal-Mart Stores, Inc.*, 700 So. 2d 308, 312-13 (Miss. 1997) (citations omitted). *See also Robinson*, 523 So. 2d at 331 ("to establish *industrial disability*, the burden is upon the claimant to prove (1) medical impairment, and (2) that the *medical impairment resulted in* a *loss* of wage-earning capacity.") (emphasis added). There is no dispute that Lipa suffered an on-the-job injury and that she experienced a wage reduction following that injury. The issue is whether substantial evidence was presented that her wage-earning capacity had been diminished as a result of that work-related injury. *See id*.

¶17.    This Court has stated that it is:

> a well-settled rule of law . . . that in determining wage-earning capacity in the situation where an *injured employee returns to work and receives the same or greater earnings as those prior to his injury*, there is created a *rebuttable presumption that he has suffered no loss in his wage-earning capacity*.

---

[10]This Court previously has explained that there is a difference between "medical disability" and "industrial disability." *See Robinson*, 523 So. 2d at 331. For purposes of workers' compensation claims, "*industrial disability*," which pertains to whether "the functional impairment . . . impede[s] the claimant's ability to perform the duties of employment[,]" is at issue. *Id*. (emphasis added).

[11]This Court has stated that "[s]everal factors must be considered in determining loss of wage-earning capacity, including 'the amount of education and training that the claimant has had, [her] inability to work, [her] failure to be hired elsewhere, the continuance of pain, and any other related circumstances.'" *Lott*, 26 So. 3d at 1049 (quoting *Alumax Extrusions, Inc. v. Wright*, 737 So. 2d 416, 422 (Miss. Ct. App. 1998)).

***Agee v. Bay Springs Forest Prods., Inc.***, 419 So. 2d 188, 189 (Miss. 1982) (citations

omitted) (emphasis added).  That presumption:

> may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity. Unreliability of post-injury earnings may be due to a number of things: increase in general wage levels since the time of accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings.[12]

***Russell v. S.E. Utils. Serv. Co.***, 230 Miss. 272, 282, 92 So. 2d 544, 547 (1957) (quoting 2

Larson, *Workmen's Compensation Law* § 57.21 (1952)).

¶18.    It is undisputed that Lipa returned to Omnova as a let-off operator at her preinjury

wage rate.  Accordingly, the "rebuttable presumption" was that she had "suffered no loss in

[her] wage-earning capacity."  *Agee*, 419 So. 2d at 188.  However, Lipa claims that she was

able to perform these duties only with the aid of a coworker.  Four or five months later, Pugh

testified that Lipa was "bumped" from that position due to layoffs, "displaced" by a "higher

senior employee . . . ."  Even according to Pugh, this "bump" was entirely unrelated to Lipa's

injury and, under the collective bargaining agreement, she could have done nothing to avoid

it.  Cox subsequently opined that Lipa had suffered no loss of wage-earning capacity as a

result of her injury.  According to Cox, the only potential loss of wage-earning capacity

---

[12]This Court has since added that "this list is certainly not an exclusive one. . . . [A]ny factor or condition which causes the actual post-injury wages to become a less reliable indicator of earning capacity will be considered." ***Gen. Elec. Co. v. McKinnon***, 507 So. 2d 363, 365 (Miss. 1987) (citing ***Hall of Mississippi, Inc. v. Green***, 467 So. 2d 935 (Miss. 1985)).

which Lipa might suffer if she left Omnova would be related to her lack of seniority at the new place of employment, not her work-related injury.

¶19.　The administrative judge's finding that Lipa "was placed in the factory trucker position *due to a lay-off* by [Omnova] and then was *unable* to return to her pre-injury position[,]" is not in accord with the conclusion that Lipa had "sustained a loss of wage-earning capacity *due to her work injury*." (Emphasis added.) The unrefuted evidence presented by all reflects that the "bump" (and attending decrease in pay) was caused by, and related to, the collective bargaining agreement, as opposed to her work-related injury. On appeal, the Court of Appeals affirmed, finding that Lipa had "suffered a loss in wage-earning capacity." *Lipa*, 2009 WL 596662, at *3. The Court of Appeals, like the administrative judge, failed to connect Lipa's acknowledged loss in wages to a work-related injury.

¶20.　The language of the administrative judge indicates the decision concerning loss of wage-earning capacity was reached – at least in part – based on Lipa's loss of her preinjury position, which decidedly was due to the union contract, not her injury. Lipa's assertion that "I can't get no . . . good paying jobs because of . . . some of the restrictions[,]" fails to satisfy the substantial-evidence standard required to rebut the "presumption that [she] has suffered no loss in [her] wage-earning capacity." *Agee*, 419 So. 2d at 189. We therefore must remand for a hearing on whether Lipa can rebut the presumption that she did not suffer a loss of wage-earning capacity, without consideration of the fact that Lipa lost her preinjury job due to layoffs/union contract policies.[13]

_____

[13]Lipa filed a "Motion for Statutory Penalties" under Mississippi Code Section 11-3-23 in the Court of Appeals, which was not ruled upon. As we reverse and remand, Lipa's

11

¶21. Accordingly, this Court reverses the MWCC, the circuit court, and the Court of Appeals and remands for proceedings consistent with this opinion.

¶22. **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, AND CHANDLER, JJ., CONCUR. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J., AND KITCHENS, J.**

**PIERCE, JUSTICE, DISSENTING:**

¶23. Today's majority opinion correctly states the standard of review in workers' compensation appeals: This Court is limited to reviewing only whether the decision of the Mississippi Workers' Compensation Commission is supported by substantial evidence. *Lott v. Hudspeth Ctr.*, 26 So. 3d 1044, 1048 (Miss. 2010) (citing *Walker Mfg. Co. v. Cantrell*, 577 So. 2d 1243, 1245-47 (Miss. 1991)) (Maj. Op. ¶ 15). However, the majority goes on to reverse the ruling of the MWCC, the Circuit Court of Lowndes County, and the Court of Appeals when substantial evidence clearly exists to support those decisions. Therefore, I must dissent.

¶24. The majority opinion states, "The Court of Appeals, like the administrative judge, failed to connect Lipa's acknowledged loss in wages to a work-related injury." (Maj. Op. ¶ 19). The majority quotes the administrative law judge where she states Lipa "was placed in the factory trucker position *due to a lay-off* by [Omnova] and then was *unable* to return to her pre-injury position," (Maj. Op. ¶19) and supposes this language indicates "the

"Motion for Statutory Penalties" is denied.

decision concerning loss of wage-earning capacity was reached – at least in part – based on Lipa's loss of her preinjury position, which decidedly was due to the union contract, not her injury." (Maj. Op. ¶ 20).

¶25. However, contrary to the assertions made in the majority opinion, the administrative law judge did, in fact, find that Lipa's loss of wage-earning capacity was due to her workplace injury. After evaluation of Lipa's physical restrictions, the ALJ stated, "[Lipa] has proven that she sustained a loss of wage-earning capacity *due to her work injury*." The ALJ further stated, "[a]lthough she returned to her pre-injury position for a few months, [Lipa] testified that she had to have assistance with lifting from a co-worker who was her friend." Therefore, the ALJ's order clearly shows that Lipa has rebutted the presumption that she did not suffer a loss of wage-earning capacity because she returned to her pre-injury job – and that her rebuttal was "without consideration of the fact that Lipa lost her preinjury job due to layoffs/union contract policies." (Maj. Op. ¶ 20).

¶26. Additionally, it has been the long-standing rule of this Court that when an injured employee has post-injury earnings that are the result of union influence, or a collective bargaining agreement, such earnings are temporary and unpredictable and do not bar a claimant from proving a loss of wage-earning capacity. *See Russell v. Se. Utils. Serv. Co.*, 230 Miss. 272, 283-284, 92 So. 2d 544 (1957). This Court has found the MWCC to be warranted in finding a loss of earning capacity where the claimant's post-injury wages were disproportionate to his or her wage-earning capacity because "in a normal labor market [the claimant] would not be able to hold [his pre-injury] job . . . without the strenuous help of the

union exercising its assignment powers . . . the influence and sympathy of the union, and the sufferance of his employers." *Id.*

¶27. Substantial evidence supports the finding that Lipa could not have returned to her preinjury job without the assistance of a coworker. The physical limitations she incurred as a result of her injury, coupled with her education and work history, support the finding that Lipa sustained a loss of wage-earning capacity. Further, because substantial evidence existed that in a normal labor market, without the influence of the union, Lipa would not be able to maintain her preinjury job, I would affirm the Court of Appeals, the Circuit Court of Lowndes County, the Mississippi Workers' Compensation Commission, and the Administrative Law Judge. This Court is bound by our standard of review, and the majority remands for a finding which already has been made. For these reasons, I dissent.

**GRAVES, P.J., AND KITCHENS, J., JOIN THIS OPINION.**